COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: September 20, 2017
Date Decided: December 21, 2017

Richard E. Berl, Jr., Esquire
Berl & Feinberg, LLP
Dartmouth Business Center—Suite 3
34382 Carpenter's Way
Lewes, DE 19958

James D. Griffin, Esquire
Parkowski, Guerke & Swayze, P.A.
19354C Miller Road
Rehoboth Beach, DE 19971

Re: *Kristen C. Wright v. Clinton A. Phillips*, Civil Action No. 11536-VCG

Dear Counsel:

This matter involves litigants, formerly husband and wife, who together own a recycling and shredding business, pursued via three business entities. Each party owns a 50% interest in each entity. The matter initially raised numerous legal and equitable issues, but the parties—wisely, in my opinion—decided to settle the matter via one co-owner buying out the other. Accordingly, this matter is before me on the sole issue of a determination of the value of the half interest in the three companies that one party will buy from the other. After a trial and post-trial briefing, I find the combined pre-adjustment value of the entities is $1,767,465, with a pre-adjustment half interest value of $883,733. This amount must be adjusted in accordance with this Letter Opinion.

# I. BACKGROUND

The parties each own 50% of DataGuard, Inc. ("DG Shredding"), DataGuard Recycling, Inc. ("DG Recycling"), and CK Aurora Business Ventures, LLC ("Aurora").[1] DG Shredding primarily shreds waste materials and DG Recycling (together with DG Shredding, the "DG Companies") recycles certain discarded materials.[2] Aurora's "sole function is to own real estate located at 9174 Redden Road, Bridgeville, DE 19933 [(the 'Aurora Property' or the 'Property')], and to lease the Aurora Property to the two DataGuard businesses."[3] The Property is encumbered by a mortgage, which amounted to $855,635 as of May 24, 2017.[4] Both of the DG Companies operate out of the Aurora Property and share some resources, including personnel and equipment.[5]

The Petitioner and the Respondent divorced in 2013 and jointly ran the businesses until they reached an impasse in 2015.[6] The businesses have done well, and the Petitioner and the Respondent were together paid a total of $300,000 in 2016.[7] The Petitioner initially filed a complaint alleging breaches of fiduciary duty

---

[1] Pre-Trial Stipulation and Order ("PTS") 1.
[2] *Id*. at 1, 5 (noting that DG Shredding and DG Recycling are both Delaware subchapter S corporations).
[3] *Id*. at 2.
[4] *Id*.
[5] *Id*.
[6] *Id*. at 3.
[7] Trial Tr. 148–49, May 24, 2017. The record states that this was taken in "salary" and as "Officers' Compensation" but does not describe if the parties received any member draws, dividends or otherwise, or detail from which entity the particular §payments came. These issues are not pertinent to my decision here, except, as noted, to the issue of "synergies."

by the Respondent and seeking his exclusion from the affairs of the business.[8] The parties each filed Motions for Order of Sale.[9] Ultimately, the parties agreed that the Respondent would purchase the Petitioner's 50% interest in each of the jointly owned businesses.[10]

The parties disagree on the value of the DG Companies.[11] The Petitioner retained Charles Sterner to value the businesses.[12] Sterner is a Certified Public Accountant ("CPA") and certified by the National Association of Certified Valuation Analysts ("NACVA").[13] Sterner completed his first report in May 2016 for the period ending December 2014.[14] He created an updated report in April 2017, but noted that he lacked certain pertinent information.[15] Sterner initially concluded that the combined value of the DG Business was $1,671,675 but revised his April 2017 estimate to $1,359,000.[16] The Respondent retained Dale Mitchell as his expert witness. Mitchell is a former CPA but allowed his certification to lapse.[17] He is a Certified Valuation Analyst.[18] Mitchell used Sterner's income figures and

---

[8] *Id.*
[9] *Id.* at 3–4.
[10] *Id.* at 1–2.
[11] *Id.* at 4.
[12] *Id.* at 77.
[13] Pet'r's Opening Br. 12.
[14] Pet'r Ex. 3.
[15] Trial Tr. 97, 109.
[16] *Id.* at 98, 124.
[17] *Id.* at 227.
[18] *Id.* at 174, 177, 181–82. Mitchell does have business experience; he owned a large record management business in the Seattle, Washington area for twenty years.

assumptions in his calculations.[19]  Mitchell created an updated report after receiving

new information from Sterner's April 2017 report.[20]  Mitchell valued the DG

Companies at $1,155,000.[21]

Sterner and Mitchell have a number of discrete disagreements on how to value

the entities.  The experts contest the applicability of marketability and brokerage

discounts, the role of certain synergies, and the proper valuation of Aurora.[22]  Sterner

accounted for the subchapter S corporation status of the DG Companies by applying

an individual tax rate of 14.5% instead of a C corporation rate of 31%, resulting in a

$204,000 valuation increase; Mitchell disagrees with this analysis.[23]

The gap between the experts' valuation of Aurora—the sole asset of which is

the Aurora Property—is wide.  The parties purchased the Aurora Property in 2009

for $1,080,000.[24]  Community Bank retained Sue Parsons at the Trice Group to

perform a real estate appraisal of the Aurora Propety in 2015 (the "Trice Report").[25]

Parsons has more than thirty years' experience in property appraisal and holds the

highest level of real estate appraisal certification.[26]  Parsons' analysis included both

---

[19] *Id*. at 183, 234.
[20] *Id*. at 184.
[21] *Id*. at 202–03.
[22] Pet'r's Opening Br. 16; Resp't's Answering Br. 16–17.
[23] *Id*. at 203 ("So the difference between the 1,600,000 or 1,360,000 and . . . 1,155,000 is about 205,000 . . . [or] the difference using a different tax rate.").
[24] Trial Tr. 31.
[25] *Id*. at 8.
[26] *Id*. at 6.

a comparable sales method and an income approach.[27] Parsons also assumed an ongoing maintenance cost of $12,000 per year in repair expenses.[28] She valued the Aurora Property at $1,375,000 under a comparable sales valuation method, at $1,425,000 under an income generation valuation method, and averaged the two to conclude that the Property was worth $1,400,000 as of February 2015.[29]

The Respondent retained Wesley Cox, a commercial real estate agent, to provide an estimate of the potential value of the Property.[30] Cox collected a series of comparable properties and calculated an average listing price of approximately $1,200,000 to $1,250,000, with a predicted sale price of $1,100,000 for the Aurora Property.[31] Cox did not use the income-generation valuation method, but conceded that such an approach could yield a higher estimated value for the Aurora Property.[32]

The Respondent also retained Gary Neal, a general contractor who previously performed work on the Property, to provide estimates for Neal's company to repair or replace particular items identified by the Respondent.[33] The total repairs came to $92,000, although Parsons disputes the necessity and relevance of some of those repairs.[34] My analysis of the parties' disputes follows.

---

[27] *Id.* at 11.
[28] *Id.* at 47–48.
[29] *Id.* at 19–22.
[30] *Id.* at 276–77.
[31] *Id.* at 275, 291.
[32] *Id.* at 296–97.
[33] *Id.* at 244–45, 259.
[34] *Id.* at 39, 47.

## II. ANALYSIS

A court of equity has authority to order the sale of a deadlocked company in certain circumstances.[35] Here, the parties have agreed to the sale of the Petitioner's half interest in the entities to the Respondent. Before me is the issue of the value of that interest. I start by analyzing the value of the entities as going concerns. Because Petitioner, via agreement, has agreed to give up, and the Respondent has agreed to purchase, an interest in a going concern (the business or businesses represented by the three entities), a fair value analysis by analogy to a Section 262 appraisal valuation is appropriate here. This requires me to determine the fair value of the three entities as going concerns as of the time of the transfer, using recognized valuation techniques.[36] The basic approach of the experts is to add the value of the Aurora Property to a valuation of the DG Companies based on an income approach analysis. I accept this methodology and address below only the parties' disputes as to valuation. I depart from appraisal action standards where, and to the extent that, equity here requires.

*A. The Corporate Tax Status*

The Petitioner argues that the DG Companies' status as S corporations adds value beyond that of a Delaware C corporation. The Respondent disputes that the

---

[35] *See, e.g., In re TransPerfect Glob., Inc.*, 2017 WL 3499921, at *1 (Del. Ch. Aug. 4, 2017).

[36] *See, e.g., In re of SWS Grp., Inc.*, 2017 WL 2334852, at *1 (Del. Ch. May 30, 2017).

S-corporation status adds value cognizable here.[37]   The Petitioner points to then-Vice Chancellor Strine's explanation of the value of subchapter S status to justify the addition of 4.08% to the capitalization rate in Sterner's reports.  In *Kessler*, this Court stated that:

> Assessing corporate taxes to the shareholder at a personal level does not affect the primary tax benefit associated with an S Corporation, which is the avoidance of a dividend tax in addition to a tax on corporate earnings. This benefit can be captured fully while employing an economically rational approach to valuing an S corporation that is net of personal taxes.[38]

To illustrate this principle, then-Vice Chancellor Strine created a chart to show that the amount of after-tax dollars returned to stockholders was greater under an S corporation than a C corporation in those circumstances.[39]

I find that the DG Companies' status as S corporations has a discrete value applicable here.  Accordingly, I find that the amount attributable to the DG Companies' status as S corporations—$204,000—should be included in the DG Companies' valuation.

*B. The Sterner Reports*

The Respondent and his expert disagree with the Sterner valuation of the DG Companies in three particulars: (i) the addition of $40,000 in Sterner's revised

---

[37] Pet'r's Opening Br. 10–11; Resp't's Answering Br. 13–15.
[38] *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 328–29 (Del. Ch. 2006).
[39] *Id.* at 329 (highlighting that, with a hypothetical $100 investment return, stockholders would receive $51 post-tax dollars from a C corporation and $60 post-tax dollars from an S corporation).

7

report; (ii) Sterner's failure to apply marketability and brokerage commission discounts; and (iii) Sterner's addition of certain "synergies" of the transaction to overall value.

First, the Respondent argues that Sterner added $40,000 to his revised report with respect to one of the entities due to a transcription error in calculating the figures.[40] The Petitioner argues that any error is harmless because it is offset by a devaluation of the other entity; essentially, any error is a wash and does not change the cumulative value of the two DG Companies.[41] Because my examination of the record confirms that any error is indeed a wash, no adjustment for the transcription error is warranted here.

Second, Mitchell applied a 20% marketability discount, including a 10% brokerage commission, because doing otherwise would "result in the Petitioner receiving the full benefit for the value of her shares but would result in passing her 50% share of those unrecognized costs on to the Respondent, who will pay 100% of those costs when he sells the entities to a third party."[42] Mitchell testified that the costs must someday be incurred and that those costs should be shared equally between the parties at the current time.[43] The Petitioner contends that, because this

---

[40] Resp't's Answering Br. 17.
[41] Pet'r's' Reply Br. 7–8.
[42] Resp't's Answering Br. 19.
[43] Trial Tr. 214–15.

transaction is between a known buyer and seller, I should not consider the transaction costs of an uncertain future transaction.[44]

I find that a lack of marketability is part of the operative reality of the entity, half of which is being purchased by the Respondent and sold by the Petitioner here.[45] While this court-enforced sale does not involve marketing the businesses, a lack of marketability is inherent in the property the Petitioner owns, and not accounting for such would result in a windfall here. I therefore include a 10% marketability discount. However, I reject the additional 10% discount that Mitchell ascribes to a brokerage commission and other costs as too speculative to be justified.

Finally, the experts agreed that the DG Companies could realize additional value through "synergies" found in the combined entity.[46] Most significantly, Sterner includes the value he opines will be attributable to the absence of his client from the business in his overall valuation.[47] The Respondent, however, argues that increasing the valuation to represent certain synergies arising from the sale is inappropriate because the DG Companies already share a single facility and other

---

[44] Pet'r's Reply Br. 4.
[45] Nonetheless, I reject the trial testimony that Bridgeville, home to the businesses here, is a "remote" small town. It may be remote to Washington, Baltimore, and Philadelphia, as those metropolises are remote to it; it is convenient, however, to Greenwood, Cannon, and Federalsburg, among many others. It is the former home of a renowned Vice Chancellor in this Court, now sadly removed to New Castle County. And as those unfortunate enough to live elsewhere learn when they visit, if they lived in Bridgeville, "[they] would be home now."
[46] Trial Tr. 147–48, 237–38.
[47] *Id*. at 95–96, 237–38.

costs, and thus will not recognize any true increase in value from the consolidation of ownership.[48]

There is a certain irony in the Petitioner's insistence that her removal from the businesses she helped to build should increase their value, in an amount of which she is entitled to half. In my view, addition to the value of these businesses of any savings from the discharge of the Petitioner is too speculative to include here. This is true particularly in light of the state of the record, which provides the amount the parties are "paid" as "Officer Compensation," but little detail about how the Petitioner's compensation is determined, the exact nature of the compensation, or what she was "paid" for. The Sterner valuation, therefore, must be adjusted to deduct from income the amount attributed to the removal of the Petitioner as a principal of the companies.

*C. The Valuation of Aurora*

The parties dispute the valuation of the Aurora Property, and by extension, Aurora. Sterner used the Trice Report and the existing mortgage debt to value Aurora.[49] The Petitioner argues that the Trice Report is the most credible valuation because it was performed by an independent appraiser hired by a bank, in contrast to a real estate agent hired directly by an interested party.[50] The Petitioner also

---

[48] Resp't's Answering Br. 23.
[49] Trial Tr. 78.
[50] Pet'r's Opening Br. 21–23.

argues that Parson's use of an additional valuation method in creating the Trice Report, the income approach, increased the accuracy of the valuation.[51] The Petitioner attacks the Respondent's hiring of Neal (who opinioned on the cost to make certain repairs) as an "obvious . . . attempt by the Respondent to reduce the amount he will have to pay" by deducting substantial but spurious repair expenses to decrease the value of the property.[52]

The Respondent points out various minor errors made by Parsons during trial and disputes the useful economic life assigned to the Aurora Property, the difference between the list and sale price, the relative familiarity Parsons with the particular comparable properties, and the timeframe and choice of comparable properties used in the Trice Report.[53]

Despite the Respondent's efforts, I find the Trice Report, performed by an appraiser and commissioned by a non-party, to be representative of the fair value of Aurora at the relevant time. I find that the addition of the income generation valuation method used in the Trice Report makes it more likely an accurate indicator of the value of the Aurora Property than the Cox estimate. Finally, I find the

---

[51] *Id*. at 21.
[52] *Id*.; Trial Tr. 40 ("I would think they would try to use [Neal's estimate] as a negotiating tool on price.").
[53] Resp't's Answering Br. 26–29, 31; Trial Tr. 42.

maintenance cost estimate in the Trice Report reasonable, and do not, therefore, discount the value for the repair costs testified to by Neal.

### III. CONCLUSION

In summary, I apply a fair valuation analysis here by analogy to Section 262. I find that the tax status of the DG Companies is relevant to their valuation, giving them an underlying value of $1,359,000, consistent with the Sterner report but subject to the adjustments below. First, the Sterner valuation must be recalculated to remove from income the amount Sterner ascribed to savings from the discharge of the Petitioner, which I have found both inappropriate and speculative. Obviously, this will reduce the value of the DG Companies to some extent. Because the record is insufficient for me to do this adjustment, I leave this calculation to the parties. Next, I find a 10% marketability discount is appropriate. Applying the 10% marketability discount to the pre-adjustment amount described above, $1,359,000, results in a fair value of the DG Companies of $1,223,100 (less the other adjustment described).

I note that the valuations employ a hodgepodge of valuation dates. Valuation should be done as of the transfer date, which I deem to be the date of this Letter Opinion (the "Transfer Date"). That will require the parties to reconcile the valuations, either by bringing them up to the Transfer Date or agreeing that for purposes of an order in this matter, the valuations shall be deemed unchanged.

12

To repeat, the DG Companies' valuation amount of $1,223,100 is subject to the following adjustments in accordance with this Letter Opinion: (1) recalculation of value after deduction from income of the amount of assumed avoided payments to the Petitioner, included as "synergies"; and (2) any minor adjustments required to accord with the parties' future agreement regarding alignment with the Transfer Date.

Lastly, I find the Trice Report of $1,400,000 to be representative of the fair value of Aurora as of February 2015. Subtracting the mortgage amount of $855,635 as of May 24, 2017, the net pre-adjustment value of Aurora is $544,365. This amount should also be adjusted to account for (1) any changes to the mortgage amount to accord with amount of the outstanding mortgage as of the Transfer Date; and (2) the parties' future agreement regarding alignment with the Transfer Date.

Taken together, the combined pre-adjustment value of the DG Companies and Aurora is $1,767,465, with a pre-adjustment half interest value of $883,733.

The parties should confer and submit an appropriate Form of Order based on this Letter Opinion. To the extent issues regarding the timing and method of payment remain, the parties should so inform me.

Sincerely,

/s/ Sam Glasscock III

Sam Glasscock III